We will hear the final argument today in No. 15-3066, Parkinson v. Department of Justice. Whenever you're ready, Mrs. McClellan. May it please the court, my name is Kathleen McClellan and I'm here representing the The court of this case is very simple. The FBI fired Mr. Parkinson, a decorated Marine Corps veteran with over 20 years of government service, because he was being too truthful. The majority of the allegations the FBI brought against Mr. Parkinson were never formally charged. Most of the charges were not sustained by the MSTV. The two remaining charges of lack of candor and obstruction stem from an OIG investigation and the context surrounding this OIG investigation is supremely important because this court ruled in Ludlam that a lack of candor charge depends on the context and the contours of the events. Speak up just a little bit. Mr. Parkinson first got involved with the OIG because he filed a whistleblowing reprisal complaint. He accused three officials of whistleblowing reprisal. The OIG interviewed those three officials in the context of that investigation and they unsurprisingly raised counter allegations against Mr. Parkinson. The OIG took it upon itself to investigate then Mr. Parkinson and launched a criminal investigation targeting him. However, the OIG investigator continued to meet with Mr. Parkinson for over six months under the guise of conducting a whistleblowing reprisal investigation. Then the OIG compelled Mr. Parkinson to an interview under oath in which he had to participate or face termination. He participated fully in that interview and the OIG investigator launched a series of false accusations including that he had stolen furniture, which he did not, including that he had pocketed $1,200, which he did not, including that he misused $77,000, which he did not. Mr. Parkinson denied those allegations, truthfully denied them, and then the FBI fired him for a pattern of denying allegations. Really, if you're denying false allegations, then you are exhibiting a pattern of telling the truth. That's why when you see what's left of the FBI's original you misused $77,000 case against Mr. Parkinson, you see that the lack of counter charges based on the difference between ask and tell. Well, that's one of the things, right? I mean, there's also the, that's one of the, that's the lack of, one of the lack of candor bases, but there's the separate obstruction basis of essentially getting to an important witness before the investigators could and getting the story memorialized. And I'm glad you brought that up because, Your Honor, the obstruction charge is not obstruct with the truth. The statement that the landlord signed, that Mr. Parkinson helped him sign, the landlord testified unequivocally that that statement was true and that it was true at the time he signed it and it was true later at the hearing. And he told the IG investigator that it was true. You cannot obstruct with the truth. What, what would have happened had Mr. Parkinson not met with him? He would have said more truth, less truth? The FBI did not prove that that statement was false. In fact, the AJ found, the administrative judge found that the FBI did not prove that that statement is false. Moreover, at the time... I'm sorry, but how do you, how do you distinguish that from a situation, or how do you distinguish this situation from one in which you get to a witness, you arrange the story, and then that witness sticks with it, and there's no objective evidence to disprove it, so that what you've got is a completely successful arranged bit of testimony. That, is that really not obstruction? Or can't be obstruction? Because you couldn't, you couldn't disprove what the witness had been... I don't think that is obstruction, Your Honor. I think that to have obstruction, you have to prove some sort of intent to not have the truth. And the administrative judge actually found that the statement was true and that the FBI did not prove that the statement was untrue. And the FBI has the burden to prove this charge. Did the administrative judge find, actually, the first of those things, that the statement was true as opposed to the FBI just didn't prove it was false? The second one, Your Honor. Okay. And there's no evidence... Wasn't there also a conclusion that, you know, the concern here is that we'll never really know what the parties would have said because, you know, in effect, they have sort of documented their testimony in a written document. And we'll never know what they would have said without that document. Yes, Your Honor. But what else could they have said but the truth? I guess we'll never know if they would have lied. We'll never know what that, quote, unquote, truth might have been. But that doesn't imply that there was any obstruction if we don't, I mean, we know what the truth was because the only evidence points to the fact that the statement was true. This statement that the parties signed was not, one, contemporaneous with the facts relating, related in the statement, correct? No, it wasn't. It was like three years later? It was. And let me explain why Mr. Parkinson went to Mr. Rada three years later. Mr. Parkinson was concerned that the FBI management officials, specifically the supervisory special agent who he accused of reprisal, they were launching this retroactive investigation. The FBI management officials, not the OIG, the FBI management officials were digging into everything he had conducted on this build-out project which had been completed for a couple of years. He viewed this as further retaliation. He told the IG he viewed this as further retaliation. He was very concerned that Ms. Lucero was going to manipulate documents and retaliate against him. Now, whether or not he was right is not at issue, but that is his honestly held belief. And so he went to the landlord to get a mutual recollection of what happened to account for the FBI management officials. And that's another point on the obstruction charges, that Mr. Parkinson did not know that there was any OIG investigated targeting him. And how would he? The OIG itself says it did not notify Mr. Parkinson until May 2010. So he did not know. And it's important to note as well that the OIG doesn't handle the majority of FBI disciplinary cases. The FBI's inspection division handles them. So there's no reason for Mr. Parkinson... The FBI what? The FBI's inspection division handles them. So there's no reason for Mr. Parkinson to think that the OIG was looking into anything but whistleblowing reprisal. And in that investigation, he was a witness and a complainant and was never told not to talk to anybody else. You know, when I read the record in this and your brief and the government's brief, and I thought I was reading two different stories. It sounds like nobody... It sounds like there were two different Parkinson's involved in this case. There aren't, are there? Well, I think there's one Parkinson who's, you know, a reserve colonel on active duty assigned to the expeditionary operations... assigned as expeditionary operations officer at Marine Corps South, who's a decorated Marine Corps officer. And then there's the Mr. Parkinson who the three officials he accused of reprisal say misused $77,000, which did not happen. And that's this entire... All of the allegations in the OIG investigation are built on a communication that he misused this $77,000. There was apparently some ruckus about furniture. Yes. The FBI falsely accused Mr. Parkinson of theft of stealing furniture. The MSPB did not sustain that charge and the charge is not before this court now. What happened with the furniture was Mr. Parkinson had brought concerns to his assistant special agent in charge for the FBI's whistleblower regulation that two pilots had been abusing the off-site and the furniture and bringing prostitutes back to the off-site and misusing FBI aircraft to solicit prostitutes. He worked very hard to make that off-site... Abusing his furniture and the conduct of that. That was at the old off-site and he was concerned when his supervisory special agent said that she was going to allow the pilots access to the off-site that he had taken it upon himself to make an operational off-site after the last one was compromised that the pilots would go back to their old ways and abuse the furniture which belonged to the landlord who he had a respectful relationship with. So he was very frustrated that the pilots were going to be able to do this so he arranged for Mr. Rata to move the furniture from the FBI off-site to Mr. Rata's warehouse. He thought Mr. Rata owned the furniture because Mr. Rata paid for the furniture. And it's interesting because Mr. Rata told the IG that he expected that the FBI would return the furniture when the lease was up but the FBI never did that and never paid him for it. But nonetheless, Mr. Parkinson was charged with theft but the MSPB found that he had no intent to steal. And that issue went away. Yes, it's not an issue. The only remaining issues are the lack of candor and the alleged obstruction with the Mr. Parkinson did not know existed. And on the lack of candor point, it's important to note that this court in Ludlam ruled that it depends on the contours and elements in the particular context. And the interrogation that the IG investigator conducted was a hostile interrogation. He interrupted Mr. Parkinson. He told him he could not mention the whistleblowing reprisal case. It was not as though it was a friendly interview. It was a compelled interview. And that's very different from Ludlam where lack of candor occurred when the employee signed a written statement that he had the opportunity to review. Mr. Parkinson is being held to saying ask instead of tell, which are synonyms, which is a distinction without a difference. If I say to someone, hold the elevator, am I asking them or telling them? Well, it depends whether you're in a position of authority. Isn't that somewhere important here that the FBI officer who's probably pretty well trained to, I don't know what the current lingo is, some sort of command presence or something, uses that. There's a meaningful distinction between asking and telling. There is, except in this case there was no, the government I'm sure is going to argue that Mr. Parkinson had this influence over the landlord. But that's simply not the case. There's no evidence to suggest that Mr. Parkinson was manipulating the landlord. The landlord testified they had a professional relationship, that he would have raised any concerns if he did. And in not accepting the hostile interrogator's word of ask or of tell and instead saying no, I asked him, Mr. Parkinson was trying to convey the substance of the conversation and trying to convey that he didn't believe that he nor any other FBI management official asking for Mr. Rada's records had the authority to demand them without a subpoena. It wasn't about whether or not he was in a position of authority or had influence over Mr. Rada or whether or not Mr. Rada would comply with his request. It was about who had the authority to demand the receipts and in Mr. Parkinson's mind, that was the OIG in the context of the whistleblower reprisal investigation. So before you sit down and reserve your time for rebuttal, do you want to say a couple of words about the legal issue at the very back of all of this about whether either the whistleblower or the other statutory arguments can be presented as defenses? Absolutely. Thank you, Your Honor. The judge dismissed the USARIN whistleblower reprisal defense as very early on in the case and restricted discovery in accordance with that ruling. However, the statutory argument is very simple and clear because it's simply based on the words of the statute. Section 7511 grants veterans appeal rights that other FBI employees do not have. That's 7511B8. They have rights that other FBI's do not have. Mr. Parkinson is not claiming that he should be able to bring a separate USARA claim or a separate whistleblower claim. It's well established that he cannot do that and that the MSPB does not have jurisdiction to hear those. However, Section 7513 grants appeal rights under Section 7701 and Section 7701 has affirmative defenses. Congress could have limited those affirmative defenses for veterans. It certainly separated out veterans in Section 7511, but Congress chose not to do that. As a preference eligible FBI agent, he had a right to appeal to the MSPB. Absolutely. The argument then is that he has a right to appeal. What restricts his right to defend himself and assert whatever defenses he might want? Absolutely, Your Honor. That's especially poignant with the USARA defense since it's his veteran status that gives him the right to appeal. The board in the Van Lenker case said otherwise. At least the majority did. Why do you believe that's wrong? What's wrong with that analysis? The board departed from its long-standing precedent in Butler v. the U.S. Postal Service and in Mack v. the U.S. Postal Service in which the board said that postal employees, even though exempt from the Whistleblower Protection Act and exempt from Section 52302b, could assert affirmative defenses. There is an argument that, well, postal workers are different from FBI agents and the fact that Congress passed a separate whistleblower statute for FBI agents under the rules established by the Attorney General means that Congress made it clear that FBI issues are going to be handled in-house, not in a public proceeding. That seems to me to be the rationale they used to distinguish the FBI circumstance from the postal worker circumstance. Am I correct? That's the rationale they used. The problem I'm having with that is that if the rationale was that Congress made it clear that FBI agents, all of that, disputes would be handled in-house, so to speak, then what about the fact that Congress made it clear that preference-eligible FBI agents could proceed with a case, a claim, before the MSPB, which presumably would air whatever dirty laundry might be out there involved in that case? I couldn't have said it better myself, Judge. But also I think the OIG report that led to the termination actually made findings on whistleblowing reprisal. So to say that you can terminate someone and say that it's not whistleblowing reprisal but the employee is not allowed to counter that, it's not logical. And there's one other point about the affirmative defenses. In addition to the 2302B, there is an affirmative defense of acting not in accordance with the law. And the Board's jurisdiction here is over the removal, but the Board is able to evaluate all kinds of laws and agency regulations and rules. It presides over collective bargaining agreements, for example. It doesn't mean that an employee who doesn't suffer an adverse action can bring a collective bargaining lawsuit before the Board, but when suffering an adverse action, when the Board has jurisdiction over an action, it's allowed to analyze laws and regulations. And as you said, Judge Lynn, there is a law on the books and a regulation on the books preventing whistleblower retaliation at the FBI. And there's no danger here that there's going to be some flood of FBI employees because there just simply aren't that many that are also preference-eligible veterans with Board appeal rights. Ms. McClelland, I'll restore your rebuttal time. Thank you, Your Honor. Ms. Devine. Ms. Devine, could we begin by first talking about the legal questions that we have here? And let me invite your attention to this lack of candor charge. Okay. I have the letter of April 26, 2012, that was written to Mr. Parkinson. And in that letter, it says, according to FBI Offense Code 2.6, dismissal is warranted when an employee, quote, knowingly provides false information in a verbal or written statement made under oath, unquote. For the purpose of Offense Code 2.6, quote, false information includes false statements, misrepresentations, the failure to be fully forthright, or the concealment or omission of a material fact slash information. That, I assume, is the charge that's being brought against him. Yes, Your Honor. The heading of that whole section is lack of candor. Yes, Your Honor. There's nothing in that offense code. I can't find lack of candor in the offense code. Where does lack of candor and whatever lack of candor means come from? So, FBI Offense Code 2.6 is- Speak up, please. FBI Offense Code 2.6 is titled lack of candor slash lying dash under oath. That's the title of FBI Offense Code 2.6. That's the title? Yes, that's the title. And that is a standard offense code for the FBI. And the definition of that is what is listed here under FBI Offense Code 2.6. That is the definition of the lack of candor. So, the title doesn't need to be part of the definition of what the offense is? Well, so there are several parts to a charge, right, Your Honor? There's the title and there's the definition of the charge, and there's also the narrative. So, it's read in its totality. But the charge itself was entitled lack of candor, but it fell under 2.6, which is- All right. But it is part of 2.6. Yes, Your Honor. Yes, Your Honor. 2.6 is quite clear. Knowingly provides, yada, yada, yada, yada. Knowingly. Yes, Your Honor. That's an interesting word. Right. It usually means conscious, intentional, purposeful. Right. Knowingly? Knowingly, yes, Your Honor. Knowingly. So, he had to know that he was engaged in a lack of candor. Yes, Your Honor. There has to be an element of deception as is recognized in Ludlam. Deception. Excuse me, an element of deception, but not an intent to deceive as is involved in falsification. Hold it. Wait a minute. You say there has to be an element of deception, but not an intent to deceive? Yes. That's what the court in Ludlam specifically made that distinction. I know that's what the court in Ludlam said, and I have no idea what they mean by that. Perhaps you can help me. How can you have an element of deception without an intent to deceive? Well, that's a good question. I would say that the element of deception would involve providing some information that you know is not 100% true, and maybe you are trying to reduce your culpability and make it seem like you're not as guilty as it appears. And you do that intentionally. Well, you do that intentionally, but intent to deceive mainly. But we need to find the relevant intent to do this, don't we? This is not a no-fault penalty. This is not a life driving. It's not a no-fault situation. That is, you don't intend to have an accident necessarily, but you still may be liable for it. But this is a case where you can't be liable unless you do something knowingly.  There would have to be a knowingly. Deceitfully. There would be an element of deception. There is not an intent to deceive, meaning there would not necessarily be an alert. But Jackie, what did he do that was his lack of candor? So there were two parts of his interview that were sustained. The two specifications from his interview. Tell me if I'm not speaking loud enough. But there are two specifications from an interview that were sustained. One was a distinction that Mr. Parkinson himself made in his testimony to the OIG. He said, I did not tell, I asked. He himself made that distinction. This is not something he was unaware of doing. He clearly said, no, I did not tell, I asked. But then later in his testimony before the administrative judge, he admitted that he directed the landlord to withhold the receipts from the FBI. The second instance is when Mr. Parkinson made the statement that nothing was done. This is before the OIG. Nothing was done without the landlord's knowledge, and that the landlord was the sole arbiter of the spending of the tenant improvement funds. In state of fact, the landlord himself made statements to the OIG and also to the administrative judge that, no, I had no idea how the funds were being spent. I was leaving this all. I was unaware. I found out later I didn't have a problem with those spent expenditures, but I was not involved in the process, and that was not a completely forthcoming and forthright statement for Mr. Parkinson to make. But the landlord did testify that everything that was done was fine by me. Correct, but that doesn't mean that. So the statement that was made by Mr. Parkinson was that the landlord was the one controlling how the funds were being spent. The landlord was the sole arbiter of how the funds were being spent, and that was not the complete truth. And that's what we're talking about here. We're talking about a special agent for the FBI who is involved in law enforcement, involved in investigations all the time, knows that he has held to this high standard of being absolutely 100 percent candid under oath. Did he understand at the time he made these statements that he was under investigation? He had to have known. I mean, he even admitted that the reason why he, for example, met with the landlord to get their mutual recollections is that he knew that there were rancid rumors and there were false accusations that were being lodged against him by the FBI. Well, that's part of the disciplinary process. When you have the FBI notice something, they report it to the OIG. The OIG does the investigation. Was the OIG engaged in interviewing him for a potential criminal charge at the time without informing him that they had shifted sides? The OIG originally came in to investigate his whistleblowing claims, didn't they? Yes, yes. But it was also, the OIG was also investigating from a report from the FBI investigating Mr. Parkinson for misuse of funds. But they didn't tell him that. They told him they were there investigating the whistleblowing charge. No, they absolutely, at the beginning of the interview, absolutely told Mr. Parkinson that they were being investigated. He admits that they told, they admitted to him that he was under investigation. That was at the very end when he. No, that was at the very beginning of the interview. That he was, at the beginning of the OIG interview. That's not there, that's not what the record says. At least it's not what he says. He stated that at the beginning he found, that the OIG said, he asked them, are you under investigation? The OIG said, am I under investigation? The OIG said yes. Yeah, but that was after so many months of the OIG meeting with him on a regular basis to talk to him about his charges. I see. That there was a whistleblowing problem. I see, I'm talking about the OIG interview. I misunderstood. Before he had the OIG interview, which by the way he was represented by counsel and he himself is an attorney, he was aware before he made his statement that he was under investigation. This was not some covert interview that was made by the OIG. Can I ask you, what is the strongest finding by the board with respect to his state of mind?  You brought up on the uncertainty about exactly what state of mind is required under Ludlum. Maybe Ludlum might be read in a number of different ways. Did the board ever find, either with respect to, I guess there are two lacks of candor and one obstruction, what were the mental element findings by the board or by the administrative judge? I'm not aware that there was that issue. In fact, that issue is, sorry, I'm unaware of where in the administrative judge's decision. I do not believe there was a specific discussion of the knowingly versus. I think everyone understands when Ludlum was clear, there doesn't have to be an intent to deceive. But I don't believe there was a specific. But it has to be deceptive. There's an element of deception. And what is the board's finding on the element of deception? That Mr. Parkinson knew that when he was testifying to the OIG or having his statement under oath to the OIG, that he knowingly said, I asked rather than told, made that distinction, and that was not fully forthcoming. That was not the complete truth. In fact, it conflicted with Mr. Rotta's statements, multiple statements to the OIG in its investigation. I'm sorry, so you used the word no. Can you point to something where the board says the words that came out of his mouth conveyed a wrong impression and he knew that? It's the and part I'm interested in. I apologize. So the board does note that Mr. Parkinson himself made that distinction. And I'm trying to find here. Is A41? Yes, I'm looking at A41. Almost 50% of the way down? No. Right. I'm trying, yes. Claiming the ass constitute. I don't think there was necessarily an affirmative finding as to the state of mind that needed to be provided, but it involved, I mean... Obviously what I'm thinking about is there's something, there's some mental element in lack of candor. Candor does have something to do with what you understand. Yes. It cannot be just a mistake. It cannot be... But the word deception could mean unintentional, negligent misrepresentation. I'm not sure where in these findings there is something about his state of mind with respect to the words that came out of his mouth. Except that he knew that they were coming out of his mouth. I don't see an affirmative statement that looks at Mr. Parkinson's state of mind here. But it can be... But the difference between his saying, I asked and I told, those are the... That is 100% clear. The fact that he was actually himself making that distinction. What should we do if we have a brief in front of us in which counsel says, you have to hold for us because... And then later on they say, we ask you to hold for us because... Should we prosecute counsel for deceptive behavior before the court? No. I would absolutely not. You've read your brief. I know. Exactly. Exactly. No. I would... First of all... There's a big difference between what we have to do and what we're asked to do. I'm not reporting the events of... First of all, I'm not a special agent for the FBI reporting the events of my interaction with a landlord on facts that are, excuse me, documents that the FBI requested and were not provided. I'm not... First of all, I'm not under oath. I'm not making a statement as an FBI employee under oath to the OIG. I mean, clearly I signed under Rule 11, but it's not the... It's not the... I would hold you to a higher standard than I would hold an FBI agent as a general proposition. That's actually very nice. But I think that... We don't need to pursue that particular analogy any further. I just make the point that it seems to me that we all use these verbs in a variety of ways. Let's move to the question of why he can't use as a defense the fact that this whole thing has a smell to it that's a little troubling. I'm sure you must have smelled it as you worked on it because he accuses his superiors in the system of misbehavior and he is concerned about a whistleblowing situation. They send in an investigator to talk to him about his accusations and his whistleblowing claim. Unbeknownst to him, the investigator starts investigating him for criminal behavior sponsored by the very same superiors who he has complained about and now he gets fired for charges that are at best marginal and he's not allowed to bring before the charge decision maker the fact that he had formally complained about the conduct of the superiors who brought the final charges against him. Do you think that has a smell to it that we need to be concerned about? I don't think so at all, Your Honor. At first point, I mean, there's a lot to say, and I have 20 seconds, but Mr. Parkinson was only investigated. The investigation started against him by the FBI, which then is part of the disciplinary process, so him saying that he knew the FBI was looking into this is not a separate thing from the OIG, but leaving that matter aside, I've lost my train of thought, but Mr. Parkinson was not investigated by the OIG and the FBI and the OIG until the new supervisor came in and saw that there were irregularities and requested receipts from the landlord, and the landlord told the FBI that Mr. Parkinson evaded the FBI multiple times. Multiple times the FBI asked for those receipts, and that's when the feelers went up. That's when things became problematic for the FBI, and when the FBI reported to the OIG, and the OIG interviewed the landlord, Mr. Roda, and said, why did you not provide the FBI the receipts? And he says, because Mr. Parkinson told them not to. This is not a situation where this is a simple offense. This is Mr. Parkinson, a special agent for the FBI, not being fully forthcoming under oath. It's a very serious offense, extremely serious offense. If Mr. Parkinson had nothing to lose, nothing that he was worried about, he would have been completely forthcoming, and he wouldn't have met with the landlord to draft a statement, the details of which later could not be fully recalled by the landlord and his staff, but he wouldn't have met. He knows better. He's a special agent for the FBI. He knows better, and who knows what the FBI would have found, what the OIG would have recovered if that meeting and statement hadn't happened. Well, I have great respect for the FBI, and I'm certainly glad that they were looking into this, but it's interesting that the serious charges that were brought against Mr. Parkinson have all disappeared, and you end up with these charges called lack of candor and obstruction. Under circumstances where I don't think it's confidential, but he was operating undercover, and he's in charge of this undercover operation and doing everything off the books, essentially. Well, there were receipts. There were supposed to be receipts kept for everything. And any charges that he had played with the money wrongly were dropped. Well, part of the problem here is that one of the charges or one of the things that the FBI was looking into was this one $1,200 check, for example, and the FBI was never able to obtain the untainted recollections of the landlord and his staff. So who knows what would have turned out. I repeat this again. It's not a situation where the agency had the full information. The OIG had the full information that there was a certain amount of obstruction, and I see that my time is way past. I did want to add one thing, unless you have further questions. I did want to add one thing, is that there is an error in our brief at the end, that USERA does not fall under 2302. It would fall under the Nonimportance with Law, Section 7701, Affirmative Defense. And if there are any other questions, thank you. Thank you. I had just a couple of things I wanted to raise on rebuttal. There was discussion of the FBI having trouble finding the receipts. I think it's important to point out that no one in the FBI ever asked Mr. Parkinson about that. And in the record on Appendix page 348, there's an email from Mr. Parkinson to the new team leader offering to assist him in any way possible that he would need.  I think that's a testament to which Mr. Parkinson is the true one, given that Mr. Parkinson's whistleblowing reprisal complaint was based on the fact that he felt his removal as team leader was whistleblowing reprisal. Secondly, I'd like to point out for the Court, what was happening just before Mr. Parkinson had to draw this distinction between ask and tell,  and the OIG investigator on A708 was engaging in very hostile questioning and interrupting him, saying things like, I'm looking at this as a civilian. There's something wrong with this. I'm not a lawyer either, but I'm just saying it sounds fishy to me. And Mr. Parkinson was defending himself. I think any employee would be hesitant to accept that investigator's terminology. Can I ask, you do make an argument in your brief about state of mind with respect to obstruction. Do you here make, and did you before the Board make, any kind of argument about state of mind with respect to the lack of candor charges? No, not per se, Your Honor, and I think I'm glad that you asked that question because it gives me an opportunity to bring this up. Until the Board's decision in Brooks-Hughes, there was really no question that this was a lack of candor charge and not a lying under oath charge. However, Brooks-Hughes decided after all the briefing was completed at the Board level, and in Brooks-Hughes, MSPB declared that violations of Offense Code 2.6 constituted falsification because of the language that Judge Plater pointed out about knowingly providing false information under oath and held the FBI to a higher falsification standard of proof. Before the Board, our argument was not on the distinction between lack of candor and falsification, but it was on the fact that there was no intent to deceive and that a lack of candor does have to include some element of deception and that the Board ought to provide clarity as to what exactly that is, given that there are a lot of charges that might be considered lack of candor but could never be sustained as falsification. We also argued before the Board that to have a lack of candor charge, it has to be some sort of material fact. Simply a mistake, as the Justice Department said, cannot be lack of candor. No one can be 100% complete and true and accurate 100% of the time. And so what we asked for in our petition for review before the Board was to provide clarity on that specific standard and what is actually required. When the Board then later took the same offense code and applied a different standard of proof, then this became a real issue of an arbitrary decision because the next FBI employee who's charged with a violation of Offense Code 2.6 labeled lack of candor slash lying under oath is not going to know before the Board if they're going to require an intent to deceive or if they're going to require an element of deception and what that means. Thank you. Thank you.